97 Cal.Rptr.2d 310 (2000)
81 Cal.App.4th 1019
RENEE J., Petitioner,
v.
The SUPERIOR COURT of Orange County, Respondent;
Orange County Social Services Agency et al., Real Parties in Interest.
No. G026981.
Court of Appeal, Fourth District, Division Three.
June 26, 2000.
Review Granted October 3, 2000.
*312 Carl C. Holmes, Public Defender, Marri Derby and Paul T. DeQuattro, Deputy Public Defenders, for Petitioner.
No appearance for Respondent.
Laurence M. Watson, County Counsel, and Ward Brady, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.
Law Offices of Harold LaFlamme, Santa Ana, and Craig E. Arthur for Real Party in Interest, the Minor.

*311 OPINION
SILLS, P.J.
Renee J. petitions for extraordinary relief from the trial court's order denying her reunification services with her daughter, Sayrah R., and setting the matter for a permanency planning hearing. She contends, among other things, that the court erred to the extent it based jurisdiction on the conclusion Sayrah was at risk due to Renee's substance abuse. She also argues the court improperly relied upon Welfare and Institutions Code [1] section 361.5, subdivision (b)(12) as justification for its denial of services, as the Orange County Social Services Agency (SSA) had specifically waived reliance upon that provision. Additionally, she contends the denial of services could not be sustained based upon section 361.5, subdivision (b)(10), because there was no evidence she had engaged in either drug use or domestic violence, the problems which previously led to termination of her parental rights regarding Sayrah's siblings and half-siblings. We issued an order to show cause and a stay of the permanency planning hearing. After reviewing the petition and opposition on their merits, we grant the petition.
Renee has an unfortunate history with her children. In August of 1999, we issued an opinion affirming orders terminating her parental rights to Christopher and Anthony (In re Dylan J. (Aug. 9, 1999) G024322 [nonpub. opn.]). In the same proceeding, she also lost her parental rights to Dylan, a half-brother to Christopher and Anthony, although she did not appeal that order. Those cases were initiated directly after Anthony's birth in September of 1996, when a toxicology screen revealed the presence of methamphetamine in Anthony's system. Renee acknowledged a long history of drug use, and admitted using methamphetamine during her pregnancy with Anthony. She also related several incidents of domestic violence with Robert R., Christopher and Anthony's father, including incidents in the presence of Dylan and Christopher. Robert also admitted to a history of drug use, and incidents of domestic violence with Renee.
Both Renee and Robert had a "very poor compliance and follow through" with their initial case plans, although Renee made sporadic attempts at drug treatment and visited with Christopher and Anthony on a semi-regular basis. The court ordered termination of parental rights in October of 1998.
Renee learned she was two weeks pregnant with Sayrah when she was incarcerated for 30 days in February of 1988.[2] She testified she ceased doing drugs when she learned of the pregnancy, "I did that knowing my past history and when I lost my three children. That's what kept me clean with Sayrah. I didn't want to lose her. Drugs have always caused me to lose *313 something as far as something dear to me."
Sayrah was born in October of 1998, without a positive toxicology screen. Renee testified that she went to Narcotics Anonymous meetings "a couple of times" after the birth, and also went to two Alcoholics Anonymous meetings. However, she has mostly relied upon regular attendance at church to help her refrain from drugs. She acknowledges that despite her abstinence, her drug problem is not really resolved and she feels additional drug treatment is necessary to achieve longterm success.
For approximately two months, from the time Sayrah was two months to four months old, Renee resumed living with Robert, the father of Christopher, Anthony and Sayrah. However, she stopped living with him because although he had made "promises to be good ... he was back to his same self. He was totally intolerable. I just could not live with him." She explained that at the time she broke off the relationship, Robert had not yet become physically abusive, but he was emotionally abusive and she felt the relationship was "about to escalate to physical abuse again so I ended the relationship."
After terminating her relationship with Robert, Renee lived with another friend for a short while, and then began living with her friend Leticia Velez, a former school teacher. In lieu of rent, Renee provided child care services for Velez's children. Velez told the social worker that she was "not very trusting of [Renee] at first because I heard she lost other kids from friends.... But, Renee's very consistent and she gave my son more structure and actually showed me to be consistent about it (discipline).... [Renee] taught my kids time-outs and how to listen to me. I was very impressed. I felt very comfortable leaving my kids with her. I trust her completely with both of my kids. My eleven-year old really liked her a lot. That really surprised me because of her history."
Velez stated further that she saw no signs of drug use by Renee during the eight or nine months she lived with her. "I know in my home, as far as I know she does not. I'm not like that because my husband, he's been in jail for that before and I always knew when he was using and I never saw that in [Renee] at all."
Renee lived with Velez steadily, except that she would stay with her boyfriend Boaz Balenti approximately twice per month when Sayrah's paternal grandparents asked to take her for a weekend. Balenti also had a drug problem, and according to his mother, Jerry Balenti, he had used drugs "on and off since high school." However, Mrs. Balenti also stated that she was not aware of Renee using drugs in the approximately one year she had known her. "No, no. I believe she has been a good influence on my son. My son said she doesn't use drugs." Mrs. Balenti noted that Renee told her she has children who were "lost to the system [and she] is desperately scared of losing this one."
Renee was still living with Velez in January of 2000, when she was picked up by police. An arrest warrant had been issued for Renee because she had failed to turn herself in to serve 60 days in jail on a prior conviction for receiving stolen property and possessing identification to commit forgery.[3] In connection with her arrest, Renee's bags and the car she was driving were searched. No drugs or drug paraphernalia was found. However, the police did find a wallet containing a checkbook and various identification and bank cards belonging to someone else. Renee admitted the wallet was not hers, but stated she had found it about a week before and planned to return it to its rightful owner. When police contacted the wallet's owner, Debra Phillips, she stated the wallet had *314 been stolen approximately two weeks earlier. The day after the theft, Phillips had received a call from a woman who identified herself as "Renee," saying she had found the wallet and offering to return it. Phillips gave "Renee" directions to her work, but "Renee" had not shown up. No charges were pursued against Renee in connection with that wallet.
At the time Renee was arrested, she had Sayrah in the car with her. Sayrah was in a car seat, facing backward, but the car seat lacked the proper base, and although the seatbelt was secured around it, it was not done in the approved manner. Renee could not provide the name of any relative to take custody of Sayrah, so Sayrah was detained by SSA.
Sayrah was initially placed in temporary homes. She was later moved to the home of her maternal grandfather and step-grandmother, who were in the process of adopting her half-brother, Dylan. At the time she was detained, Sayrah was reported to be "happy and healthy" and "within normal limits developmentally."
SSA asserted jurisdiction based upon section 300, subdivisions (b) (failure to protect), (g) (no provision for support) and (j) (abuse of sibling). The jurisdictional hearing was held on February 23, 2000. According to a declaration filed by Renee's counsel, when the hearing was called, they sought a continuance. They were already aware that SSA was recommending no reunification services, which made the case a high stakes one. The public defender assigned to the courtroom was new to juvenile court, and unprepared to handle it. The court indicated an inclination to continue the dispositional aspect, but not the jurisdictional. At that point, SSA's counsel stated that it would be basing its request for denial of reunification on section 361.5, subdivision (b)(10), (hereinafter "subdivision (b)(10)") but not on section 361.5, subdivision (b)(12) (hereinafter "subdivision (b)(12)"). Based upon that assurance, Renee's counsel announced "ready" and the jurisdictional hearing proceeded. SSA does not dispute those facts.
The social worker testified, reciting the circumstances of Renee's arrest and her history with SSA. She conceded she had done no investigation to determine Renee's recent drug usage, other than to ask Renee if she had completed any programs. She also conceded she had "no proof of drug use or abstinence at this time." She stated that her belief Renee's drug history affects her ability to parent Sayrah was based entirely on the fact that Renee's drug usage dates back a long time and she had not completed any rehabilitation program.
Renee also testified. She again denied any drug usage or domestic violence since being pregnant with Sayrah. She conceded she had committed the crimes which led to her arrest, explaining that she was trying to get money to get herself and Sayrah away from Robert. She admitted she was aware of the requirement that she turn herself in to serve 60 days, and of the warrant subsequently issued for her arrest. She also admitted she was trying to avoid being apprehended. She explained she had planned to turn herself in, but she "was trying to get things together to have a secure, safe place for Sayrah to stay." At the time of the hearing, Renee was still incarcerated (for her original 60-day sentence plus additional time for the probation violationfailure to appear) but was scheduled for release on April 11, 2000.
At the conclusion of the hearing, the court amended certain of the findings to conform to proof, but sustained jurisdiction based upon all three grounds asserted by SSA.
The dispositional hearing followed on March 14, 2000. Consistent with its prior waiver, SSA's report recommending no reunification services relied solely on subdivision (b)(10). The social worker again testified. She reiterated her "opinion" that Renee had not abstained from drugs during Sayrah's lifetime, but again conceded she had no factual evidence to support *315 that opinion. She agreed she had no reason to believe that Velez, the friend with whom Renee lived, had any substance abuse problems, but felt it significant that Velez apparently knew people (including her incarcerated husband) who did. Her recommendation that Renee be denied reunification services was based primarily on the fact she had lost her prior children, and that she had not, in the social worker's view, done anything since then to change the prognosis for her completing services for Sayrah.
Renee also testified again. She stated that since her incarceration, she has been attending some Narcotics Anonymous meetings and Alcoholics Anonymous meetings. She has gone to church as much as possible and written "inmate slips" to try to participate in substance abuse and parenting classes. She was finally able to get into a parenting class after five weeks, but then could not participate because it conflicted with her work schedule. She explained that because the parenting classes are not court ordered, the jail would not accommodate the conflict. She also completed Great Escape, a rehabilitation referral program offered in jail. Through Great Escape, she had made arrangements to enroll in a drug program called New Directions upon her release from jail. She stated that because she was incarcerated, she was not seeking to have Sayrah returned to her custody; she was seeking only to obtain reunification services.
At the conclusion of testimony, the attorneys argued. The only statutory ground addressed was subdivision (b)(10). In fact, when the court made reference to subdivision (b)(12) and questioned whether Renee's counsel was arguing off track, he specifically reminded her that the statutory subsection at issue was subdivision (b)(10). The court responded "I'm sorry. I wasn't clear," and proceeded to focus on subdivision (b)(10). At the conclusion of the hearing, the court held that denial of reunification services was justified based upon both subdivisions (b)(10) and (b)(12). "Under both the A and the B provisions of subdivision (b)(10), reunification services are not appropriate in this case. The court will make the additional finding that's [sic ] not required to deny reunification services, but (b)(12) of subdivision 361.5 applies as well. [Renee] has a history of abuse of drugs and alcohol. That was her testimony today."

I
Renee first contends the court erred in basing its jurisdiction finding in part upon the aspect of section 300, subdivision (b) which states "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness ... by the inability of the parent or guardian to provide regular care for the child due to the parent or guardian's ... substance abuse." She contends there was no evidence presented which would establish the fact that Renee used drugs during Sayrah's lifetime, let alone that such drug use impaired Renee's ability to parent.
Her argument is appealing. As noted in the factual discussion above, SSA presented no evidence, beyond rank speculation, that Renee had been using drugs since her pregnancy with Sayrah. There was no positive toxicology screen when Sayrah was born, no failed drug tests, no witnesses claiming to have seen Renee using drugs or under the influence of drugs, and no drugs or drug paraphernalia found on Renee when she was arrested. Sayrah was reported to be happy and healthy when she was detained. Under those circumstances, there was simply no evidence that Renee's drug problems, no matter how long standing, were impairing her ability to parent Sayrah on a current basis. (See In re Rocco M. (1991) 1 Cal.App.4th 814, 824, 2 Cal.Rptr.2d 429 ["While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm."].)
*316 However, as SSA points out, the finding of jurisdiction in this case was based on several provisions of section 300. We must uphold the finding if it is supportable on any ground cited (In re Jonathan B. (1992) 5 Cal.App.4th 873, 875, 7 Cal.Rptr.2d 277), and Renee does not even attempt to argue against the court's reliance on section 300, subdivisions (g) and (j). Under those circumstances, the error, if any, was harmless.

II
Renee next contends the court's denial of reunification services based upon subdivision (b)(12) cannot be sustained because SSA specifically waived its reliance on that subdivision and Renee relied upon that waiver. We agree.
As this court has previously noted: "`[P]arents are entitled to due process notice of juvenile proceedings affecting their interest in custody of their children. [Citation.] And due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." [Citation.]'" (In re Anna M. (1997) 54 Cal.App.4th 463, 468, 62 Cal.Rptr.2d 831, quoting In re Melinda J. (1991) 234 Cal.App.3d 1413, 1418, 286 Cal.Rptr. 239.) Consequently, "... a parent is entitled to be apprised of the charges he [or she] must meet in order to prepare his [or her] case, and ... must be given an opportunity to be heard and to cross-examine his [or her] accusers." (In re Neal D. (1972) 23 Cal.App.3d 1045, 1048, 100 Cal.Rptr. 706 [disapproved on other grounds in In re B.G. (1974) 11 Cal.3d 679, 114 Cal.Rptr. 444, 523 P.2d 244].)
In this case, SSA specifically assured Renee's counsel it did not intend to proceed based upon subdivision (b)(12). Its report recommending denial of reunification mentioned only subdivision (b)(10). Its argument at the dispositional hearing mentioned only subdivision (b)(10). Consequently, Renee's counsel also focused exclusively on subdivision (b)(10), going so far as to correct the court when it asked a question directed toward subdivision (b)(12).
Because SSA specifically eschewed reliance on subdivision (b)(12), Renee had no notice it was in issue, and was deprived of a meaningful opportunity to address it. Accordingly, the court erred in relying upon that subdivision in denying reunification in this case.

III
Renee next asserts the court could not properly deny reunification based upon subdivision (b)(10), because there was no evidence that she had engaged in either domestic violence or substance abuse, the problems which led to the loss of her other children, at any time since Sayrah's birth. Instead, Renee testified that she had taken steps to address those prior issues by breaking off her relationship with Sayrah's father and abstaining from any drug use. In the current case, Sayrah was detained because Renee was picked up on a warrant and incarcerated on a criminal charge unrelated to drugs or violence.
This issue is closer, and more complicated, but ultimately we agree that in the absence of any evidence Renee was still using drugs, the court could not simply assume, as the social worker admittedly did, that she was. There must be substantial evidence, i.e., evidence which is "reasonable, credible and of solid value" to support the court's conclusion. (In re Jasmine C. (1999) 70 Cal.App.4th 71, 75, 82 Cal.Rptr.2d 493.) And if Renee has actually abstained from drug use since the beginning of her pregnancy with Sayrah, we conclude that constitutes "a reasonable effort to treat the problems that led to removal" of Sayrah's siblings (see subd. *317 (b)(10)), which entitles her to a shot at reunification.[4]
Section 361.5, subdivision (b)(10), provides "Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, ... the following: [¶] ... [¶] (10) That (A) the court ordered termination of reunification services for any siblings or half-siblings of the child because the parent or guardian failed to reunify with the sibling or half-sibling after the sibling or half-sibling had been removed from that parent or guardian pursuant to Section 361 and that parent or guardian is the same parent or guardian described in subdivision (a), or (B) the parental rights of a parent or guardian over any sibling or half-sibling of the child had been permanently severed, and that, according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half-sibling of that child from that parent or guardian."
SSA first argues that it is immaterial if Renee has subsequently made a reasonable effort to treat the problems which led to the removal of her other children, because that escape clause applies only to part (B) of subdivision (b)(10), and not to part (A). According to SSA, denial of services under part (A) requires only that the court have terminated reunification services for another sibling. Renee disagrees, and apparently the courts have disagreed with each other on this issue as well.
Renee relies upon Shawn S. v. Superior Court (1998) 67 Cal.App.4th 1424, 80 Cal. Rptr.2d 80. In Shawn S., the mother had previous children removed from her custody and failed to reunify. Her children were subsequently put into long-term foster care, but her parental rights had not been terminated. Thus, she fell within the scope of part (A) of subdivision (b)(10) but not within part (B). The trial court failed to consider whether she had made a reasonable effort to treat the problems which led to the removal of her other children, as it apparently determined that such an inquiry was unnecessary under part (A). The Court of Appeal disagreed. It first noted "We do not believe the Legislature intended those parents who previously have had siblings or half-siblings of the current dependent child placed in permanent plans to have any less opportunity to reunify with a later child than those whose parental rights as to previous siblings and half-siblings have been severed." (Shawm S. v. Superior Court, supra, 67 Cal. App.4th at p. 1428, 80 Cal.Rptr.2d 80.)
The Shaim S. court also found support for its position in California Rules of Court, rule 1456(f)(4)(J), which follows the provisions of subdivision (b)(10) but lumps together the (A) and (B) requirements that reunification services have been terminated or parental rights have been terminated as to a prior sibling, while specifically separating out the required finding that the parent has not made reasonable efforts to treat the problems that led to the loss of that sibling.
SSA relies upon Marshall M. v. Superior Court (1999) 75 Cal.App.4th 48, 88 Cal. Rptr.2d 891, which takes the opposite position. In Marshall M., the court specifically rejects the analysis of Shawn S. and interprets subdivision (b)(10) differently. It concludes that part (A) refers to parents who have previously received, and failed, reunification with other children, and thus who should be considered to have already "failed to take reasonable steps to treat the problems" which led to the removal of those children, as a matter of law. Part (B), according to Marshall M., refers only to those parents who had parental rights *318 severed in a prior case, but without receiving any reunification. The court suggests that the "classic situation" under part (B) would be "A parent's complete abandonment of a child based on the unknown whereabouts of that parent...." (Marshall M. v. Superior Court, supra, 75 Cal. App.4th at pp. 56-57, 88 Cal.Rptr.2d 891.)
We agree with Shawn S. and conclude that denial of reunification services under subdivision (b)(10) requires a finding that the parent "has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling...." Our disagreements with Marshall M. are several. First, we note that part (B), referring to the situation in which parental rights have been severed, does not state that it would apply only when no reunification was offered in the prior case. The Marshall M. court simply implied such a restriction to bolster its analysis. Second, even assuming such a restriction could be implied, we find it hard to believe that the Legislature would favor a parent who completely abandoned a sibling, and failed to participate in the proceedings leading up to termination, over one who at least made some effort, no matter how defective, to remain in a child's life and reunify. In our view, abandonment of a child is the ultimate failure to reunify. Third, we cannot accept Marshall M.'s conclusion that under part (A) the failed reunification itself would, as a matter of law, constitute the parent's failure to make "a reasonable effort to treat the problem that led to removal of the sibling ..." as specified in subdivision (b)(10). To the contrary, the language of subdivision (b)(10) is requires that the failure to make a reasonable effort to treat the problem must occur "subsequently."
Ultimately, however, our agreement with Shawn S. is based upon an analysis of the language and grammatical structure of subdivision (b)(10) itself. Leaving out much of the substance, the subdivision provides that reunification services need not be provided if the court finds "That (A) ..., or (B) ..., and that, according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling...." (Italics added.) The fact the Legislature began the clause with a "that" and then prefaced the subsequent reasonable efforts language with a separate "and that," convinces us it intended a distinct requirement, in addition to either part (A) or part (B).
Consequently we must consider whether the evidence in this case was sufficient to establish that Renee subsequently failed to make a reasonable effort to treat the problems that led to the removal of Sayrah's siblings. On that point, SSA makes only a brief argument. It contends, as did the social worker at the hearing, i.e., that evidence of abstinence is immaterial without evidence of completed drug treatment programs. As it explains "[u]nfortunately, mother cannot show that she has been sober for those 20 months because she never made a reasonable effort to treat her 13-year drug problem, i.e., completion of a drug rehabilitation program." SSA goes on to point out that Renee's probable drug use is established by her "transient" lifestyle, her close association with a known drug user (referring to Renee's sometime boyfriend Balenti), her avoidance of police apprehension and her commission of a crime "for the specific purpose of accruing money to leave the area." We do not think any of those factors establishes drug use.
Although the trial court characterized Renee's lifestyle as "transient" (upgraded from "homeless"), the evidence was that she had lived continually with her friend Velez for eight or nine months prior to her arrest, and had performed child care duties in exchange for her rent. And although she did have a relationship with Balenti, the only evidence was that she did not engage in drug use with him. His mother characterized Renee as a "good influence." Renee's avoidance of police *319 had nothing to do with drugs, nor did her desire to obtain money to leave the area.
In our view, there was no substantial evidence that Renee was engaging in drug use during Sayrah's life. In fact, there was no evidence at all that Renee was not abstinent, as she claimed. Such abstinence, while clearly not evidence that Renee's drug problem is cured, is certainly represents a substantial step toward resolving the problem which led to the removal of her other children. Given Renee's prior history, it is impressive. SSA's argument, which focuses solely on completion of drug programs, while ignoring evidence of abstinence outside of a program, strikes us as form over substance. Obviously, the ultimate goal is abstinence, not programs. Given that fact, evidence of abstinence should be considered the most important evidence that a drug problem is being addressed.
Of course, we do not mean to suggest that Renee's history should not come into play at all. If during her initial six months of reunification, she fails in any substantial way to comply with her reunification obligations, the court would be free to consider her poor history in denying further services, even though such services might be extended in a case with no prior history.[5]
The petition for extraordinary relief is granted. The juvenile court is ordered to vacate its order denying reunification services and setting the matter for a section 366.26 permanency hearing. The court shall hold a new dispositional hearing at which it will offer reunification services for Renee and Sayrah. This court's prior stay is dissolved.
BEDSWORTH, J., and O'LEARY, J., concur.
NOTES
[1] All further statutory references are to the Welfare and Institutions Code.
[2] The record is not specific as to the exact charge, identifying it only as "Penal Code  forgery."
[3] Our record does not make clear when those crimes were committed. It suggests she was originally arrested on April 16, 1999, and convicted on July 7, 1999.
[4] Although domestic violence was also an issue in Renee's loss of her other children, no substantial arguments directed toward that issue were made in this case. The parties have focused almost exclusively on Renee's drug hislory as a basis for denying her reunification. We will do so as well.
[5] Because we have determined that Renee did not fall within all the parameters of subdivision (b)(10), and thus that reunification services should have been provided, we need not reach Renee's other contentions.